(136 So. 575)

**CUBAN AMERICAN TRADING CO. v. S. PFEIFER & CO.**

No. 28742.

July 17, 1931.

Charles Rosen and Louis L. Rosen, both of New Orleans, for appellant.

Henry W. Robinson and Henry M. Robinson, both of New Orleans, for appellee.

O'NIELL, C. J.

This is an action for damages for an alleged breach of contract. The plaintiff obtained judgment for the amount sued for $2,473.25, and the defendant has appealed.

The loss sustained was the result of two shipments of eggs sold by the defendant

to the plaintiff, delivered ship's side, in New Orleans, and shipped by the plaintiff to Cienfuegos, Cuba. Each shipment was of 200 cases of eggs, 150 cases of Kansas eggs, and 50 cases of Texas eggs. The first consignment was delivered on the wharf on the evening of the 10th of July, 1925, and shipped on the Steamship Managua about noon the next day, and arrived in Cienfuegos on the 15th of July, 1925. The second consignment was delivered on the wharf on the evening of the 16th of July, 1925, and shipped on the Steamship Rama about noon the next day, and arrived in Cienfuegos on the 21st of July, 1925. Each shipment was placed in cold storage immediately on arrival in Cienfuegos. The eggs came out of cold storage, having a temperature of 30 to 31 degrees, in New Orleans, and were shipped in air cooled vessels, in a temperature of 80 to 81 degrees, the outside temperature in New Orleans being then about 90 degrees. On arrival in Cienfuegos, 216 cases of the eggs, of the total of 400 cases, were decomposed, 111 cases were merchantable, but only at a great discount, and only 73 cases were in first-class condition.

Plaintiff contends that one of the conditions of the contracts of sale was that the defendant should "candle" every one of the eggs after taking them out of cold storage in New Orleans and before delivering them; and that, if the defendant had so candled the eggs and found them sound, they would have been in sound condition on arrival in Cienfuegos. "Candling," in the egg trade, means inspecting the eggs by means of an artificial light. The defendant denies that the contracts required that each egg should be candled at the time of delivery; and avers that the eggs were candled before they were placed into cold storage; that they were again inspected and a fair percentage of them candled at the time of shipment; that they were delivered in a sound condition; and that whatever deterioration occurred was due to the shipping of the eggs in ships that were not equipped with refrigerators, and the consequent exposing of the eggs too long to a high temperature before replacing them in cold storage.

It is conceded by the plaintiff that the right of recovery depends upon whether the contracts required the defendant to candle every egg at the time of delivery. The two deliveries of Kansas eggs were a part of a written order for 600 cases, accepted by the defendant on the 27th of June, 1925, to be delivered in four lots of 150 cases each, one delivery to be made each week in July, on shipping instructions to be given by the plaintiff. There was no stipulation for candling the eggs in that contract. The two sales of the Texas eggs were verbal contracts, 50 cases being contracted for in the early part of July, and 50 cases on or about the 15th of July, 1925. The testimony leaves no doubt that there was no stipulation for candling the eggs, in either of these contracts.

In support of the contention that the contracts required the defendant to candle every egg at the time of delivery, the plaintiff relies upon a notation on the face of the invoices which he received, and on which he paid for the eggs, viz.: "Double strapped and candled." "Double strapped" meant that the cases were bound with wire; and in fact every case was so bound. The notation "Double strapped and candled" did not appear on the carbon copies of the invoices retained by the defendant. The explanation was given by the defendant's clerk who delivered the invoices to the president of the Cuban American Trading Company when the eggs were delivered, and who collected for them. The company's office in New Orleans was immediately across the street from the defendant's place of business. When the clerk presented

the invoices to the president of the Cuban American Company, the latter requested that the notation "Double strapped and candled" be made on the invoices to facilitate his disposing of the eggs. The clerk returned to the defendant's office and, without consulting any one, had a stenographer typewrite on the face of each invoice, "Double strapped and candled." The invoices were then delivered by the clerk and paid for by the president of the Cuban American Company. The neglect of the defendant's clerk to inform one of his superiors of his intention to make the notation on the invoices may be accounted for by his lack of experience, for he was only 22 years old and had had only two years of business employment. These facts, of course, might not relieve the defendant of liability if the notation on the invoices had served to deceive the president of the Cuban American Trading Company, or any customer of the company; but the fact is that the notation on the invoices was not intended to deceive, and could not have deceived, the president or any customer of the Cuban American Trading Company. The president of the company had suggested having every egg candled and had been told that they would not be so candled, except at an extra cost of 40 cents per case, which he had declined to pay. When he requested the clerk to put the notation "Double strapped and candled" on the invoices, he was reminded again that every egg had not been recandled when the eggs were taken out of the cold storage. As a matter of fact, the notation on the invoices, that the eggs were candled, was not a falsification, because, according to the custom of the trade, these eggs were classed as candled eggs. According to the custom of the trade, and the rules of the Chicago Mercantile Exchange, which rules govern generally all wholesale egg transactions throughout the United States, cold storage eggs are classed as candled eggs if they were candled when placed into cold storage, that is to say, at the place of origin, and if they are again inspected when taken out of cold storage for delivery to a buyer, by the candling of a fair percentage, say 10 to 15 per cent., of them, to determine their average condition. In this instance the eggs were candled at the place of origin, when placed into cold storage; and, when they were taken out of cold storage in New Orleans for delivery to the buyer, they were inspected by the candling of 10 or 15 per cent. of the number of cases, and were found to be in sound condition. There are 30 dozen eggs to the case; and, of all of the eggs candled, the average number of defective eggs to the case was only one dozen, being 8 or 9 cracked eggs and 3 or 4 spoiled eggs. The rules and custom of the trade allow 2 dozen cracked or spoiled eggs to the case, which loss the buyer bears. These facts, with regard to the custom of the trade, were proven by the testimony of five exporters of eggs, who had been in the business extensively for many years, and one of whom is the most extensive exporter of eggs in the United States, shipping 200,000 to 240,000 cases of eggs per year. The testimony of these witnesses is not contradicted, except in a measure by the testimony of one witness, who is shown to have been not well informed, and whose testimony is discredited.

The five exporters whom we have referred to testified also that it was not possible to ship cold storage eggs from New Orleans to Cuba in July, in air cooled ships, and not in refrigerators, without sustaining as great a loss as the plaintiff sustained on the two shipments in question. These witnesses testified that the only safe method of shipping eggs from this country to Cuba, in the summer months, was in refrigerator cars, via Key West, where the cars are re-iced and transported by ferry to Havana. Some of these New Orleans ex-

porters had shipped eggs from New Orleans to Cuba in air cooled ships, in the summer, and their losses, invariably, were so great that they abandoned that method of shipment in the summer months. So did the plaintiff in this case.

From all of the evidence in the case, we are convinced of the following facts: First, that the defendant was not obliged by the contracts of sale to candle every one of the eggs when they were taken out of cold storage in New Orleans for delivery to the plaintiff; second, that the eggs were properly inspected, according to the custom and rules of the trade, and were delivered in sound condition, and were in fact "candled" eggs, according to the custom and rules of the trade; and, third, that the loss which the plaintiff suffered was the natural and inevitable consequence of the method which he chose for shipping the eggs. The obligation of the seller having been fulfilled by the delivery of the eggs at the ship's side, the shipments were, of course, at the risk of the buyer.

The judgment is reversed, and the plaintiff's demand is rejected, and its suit dismissed at its cost.